### THE J. W. SCOTT.

(District Court, S. D. Florida. April 20, 1923.)

No. 1246.

1. **Maritime liens** ⊜⟹24—*Furnisher of coal to tug held entitled to lien.*

One furnishing coal to a tug, taking slips, signed by the master, stating that it was sold on the credit of vessel and owner, for which it sent bills monthly to the owner, *held* entitled to a lien, under Act June 23, 1910 (Comp. St. §§ 7783–7787), for so much of the account as remained unpaid.

2. **Maritime liens** ⊜⟹61—*Lien held not lost by laches.*

That suit for enforcement of a lien for coal furnished was not brought until eight months after the last coal was furnished, and after the tug had been sold, *held* not such laches as defeated the lien, where the tug was in other waters and libelant had no knowledge of the sale.

In Admiralty. Suit by the North River Coal & Wharf Company against the steam tug J. W. Scott; Marcelino Garcia, claimant. Decree for libelant.

⊜⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

William Matthews, of New York City, and Kay, Adams & Ragland, of Jacksonville, Fla., for libelant.

P. L. Gaskins, of Jacksonville, Fla., for claimant.

CALL, District Judge. On December 4, 1920, libelant filed its libel against the steam tug J. W. Scott for coal furnished the vessel during the months of December, 1919, and January, February, and March, 1920, in the sum of $2,400. December 14, 1920, claimant filed his answer, alleging want of knowledge of the furnishing of the coal, and requiring strict proof of same. The answer then proceeds to put in issue the acquisition of a maritime lien for same, and further pleads that, if such was acquired, it was lost by the laches of the libelant in enforcing same.

On these issues testimony was taken under stipulation by the respective proctors. At the hearing there was no point made that the coal was not furnished, nor the value of same. It was contended by claimant that the coal was furnished the vessel under such circumstances that no lien arose under the statute, and if such lien ever existed it was lost through the laches of the libelant, and it is these two contentions that are to be decided upon the testimony in this case. The testimony shows the following facts:

The tug, up to June 28, 1920, was owned by the Guidera Towing & Transportation Company, a corporation. On said date she was transferred to one J. C. Hernandez for Marcelino Garcia; said Garcia being a citizen of Cuba and unable to take title himself without a permit from the United States government. Subsequently this permit was obtained, and the vessel was transferred to Garcia. The consideration for the transfer of the vessel was paid by Garcia on June 28, 1920. After receiving some repairs in New York, the vessel was cleared and left New York Harbor during July, stopping at Norfolk, Beaufort, Wilmington, and Jacksonville, Fla. Repairs were made at each of these places, except Jacksonville, and libels filed against the vessel for salvage and repairs, and stipulations filed for her release by claimant.

The testimony shows that the libelant furnished coal for the Scott from some time in 1917 to and including March, 1920; that the accounts for coal so furnished were furnished monthly at the end of each month for the coal furnished during that month to the Towing & Transportation Company, and paid by it up to the month of December, 1920; that at the time coal was delivered to a boat a slip was signed by the captain, acknowledging receipt of the number of tons upon the boat. These slips bear in large letters on their face this legend: "All coal sold on the credit of vessel and owner." The page of the sales ledger introduced in evidence shows the account carried in the name of the "Guidera Towing & Transportation Company," containing entries of December 31st, January 31st, February 29th, and March 31st. The pages of the sales record show the business for each of those months, with names of the owner, the boat, the number of tons, price, and war tax; presumably each of these records were made from the slips introduced in evidence.

It was shown in evidence that, subsequent to the sale of the tug to

claimant, libelant received a promissory note for the amount due, and allowed the same to be renewed upon its coming due, but that it was stipulated that the right to a lien should not be waived thereby; that libelant knew nothing of the sale of the tug, but supposed she was still being operated in the harbor of New York, and knew nothing of the tug having left New York until shortly before the filing of the libel in this case; that libelant knew nothing of the libels at Beaufort and Wilmington. The claimant shows by his testimony that the only inquiries as to liens that might exist upon the tug were from the vendor and an examination of the custom house records, that he knew nothing of the existence of the claim in suit, and that at the time of purchase of the tug she was not in operation, but had sunk, and when seen was at a dry dock. He also shows various expenses for repairs, etc., since acquiring the vessel, and that he paid full value for her.

[1] As to the first question: Did libelant acquire a maritime lien? I am of opinion that it did. As I understand the statute (Act June 23, 1910, 9 Fed. Stats. Ann. [2d Ed.] 346 [Comp. St. §§ 7783–7787]), any person furnishing supplies upon the order of the owner or master has a maritime lien upon the vessel. This right to a lien may be waived by the furnisher of the supplies by agreement or otherwise. Certainly there is no testimony showing that libelant by agreement waived this right. Did it by its course of conduct waive it? I can find no testimony indicating such waiver. On the other hand, by the pink slips used to make up the records the libelant clearly indicates its intention to reply upon such lien. The fact that it looked to the vessel and the owner as well would not, under the act of Congress, indicate an intention to waive it. Nor do I think the course of dealing indicates any such intention. The bills were rendered monthly, it is true; but this seems to me a mere business convenience.

[2] The question remaining is: Did the libelant lose its lien by laches in the enforcement of it? The law is well settled that one may lose his lien by laches in enforcing it, and this is recognized by the statute before noticed. The lapse of time alone may not constitute such laches which would bar the assertion of the lien. There must be other circumstances combined with the lapse of time, making it inequitable for the lienor to enforce his lien. I do not find such circumstances existing in the testimony before me in this case.

While it is apparent that the claimant got a bad bargain in the purchase of the boat, that is no reason why the libelant should suffer. It seems to me that the claimant was overreached by his vendor, and it is to such vendor that he must look for relief.

A decree will be entered in favor of the libelant for $2,400, with interest at the rate of 6 per cent. from December 4, 1920, to date of decree.